# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

LORENA PETERS,

          Plaintiff,               CASE NO. 16-12066
                                    HON. DENISE PAGE HOOD

v.

UNIVERSITY BANK and MIDWEST
LOAN SERVICES, INC.,

          Defendants.

_____/

## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [#18],
## DENYING PLAINTIFF'S MOTION TO FILE SUR-REPLY BRIEF [#29]
## AND SCHEDULING ORDER

## I. BACKGROUND

### A. Procedural Background

On June 7, 2016, Plaintiff Lorena Peters ("Peters") brought this action against Defendants University Bank ("University Bank") and Midwest Loan Services, Inc. ("MLS") (collectively, "Defendants"), alleging that Defendants violated the American with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* (Count I), the Michigan Persons with Disabilities Civil Rights Act (PWDCRA), MCL § 37.1101 *et seq.* (Count II), the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 (Count III),  Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et*

*seq.* (Count IV), and the Elliott-Larsen Civil Rights Act (ELCRA), MCL § 37.2202 *et seq.* (Count V). (Doc #1) Peters seeks injunctive relief, and compensatory and punitive damages. *Id.* Defendants filed an Answer on September 23, 2016. (Doc # 8)

This matter is before the Court on Defendants' Motion for Summary Judgment filed on August 14, 2017. (Doc # 18) Plaintiff filed a Response on September 18, 2017. (Doc # 22) On October 2, 2017, Defendants filed a Reply. (Doc # 24)

## B. Factual Background

MLS is a mortgage loan subservicing company located Houghton, Michigan that services mortgages for financial institutions. (Doc # 18, Pg. 9) MLS was formerly a subsidiary of, and is now a department of University Bank. From February 21, 2005 to May of 2014, Lorena Peters worked as a Customer Service Associate ("CSA") in the Customer Services Department at MLS. (Doc # 22, Pg. 5; Doc # 18, Pg. 9) The Costumer Services Department manages, in part, incoming calls to its customer service call queue. The CSAs answer the incoming calls to the queue. (Doc # 18, Pg. 9) CSAs process payments, assist borrowers in the queue with payments, process transaction histories, and explain escrow and payments for customers. CSAs work Monday through Friday on staggered, eight hour shifts between 8 a.m. and 8 p.m., with a one hour lunch break.

Peters retained the title of Spanish Language Specialist for most of her tenure at MLS. As the Spanish Language Specialist, Peters's primary responsibility was to provide services to MLS's Spanish-speaking borrowers. (Doc # 22, Pg. 5) Peters's secondary function was to quote payoffs (a financial statement indicating the total amount to be paid in full by a certain date for a particular borrower).

Nearly 90% of the Spanish-speaking calls Peters handled came from borrowers of MLS client Baxter Credit Union. (Doc # 18, Pg. 10) In 2010, Baxter ended its relationship with MLS, which led to a dramatic reduction in the number of Spanish-speaking calls handled by MLS. In response to this change, Ed Burger, then MLS President, directed Peters's supervisor Rick Ginter ("Ginter") to assign her to the queue with the other CSAs. (*Id.* at 11) Ginter informed Peters that she would be required to start servicing MLS's English-speaking customers. (*Id.*) Peters struggled with the transition, and despite efforts by Ginter to assists, Ginter eventually allowed Peters to work almost exclusively on payoffs and not the queue. (*Id.*)

On September 17, 2010, Peters filed an internal complaint against Ginter. (*Id.*) Peters complained, in part, that Ginter asked her to take an English language class to improve her English, and that Ginter was attempting to force her to speak on the phone with customers in English when she was hired to assist Spanish-

speaking callers. (*Id.*) Cathy Revord, the SVP, Chief Human Resources Officer, investigated Peters's complaint. After completing the investigation, Revord told Peters she had addressed Peters's issues, and instructed Peters that her work duties at MLS included working in the queue with English-speaking callers. (*Id.* at 3-4)

Sometime in 2012, Peters notified Ginter about her arthritic condition. (Doc # 22, Pg. 6) At that time, Peters informed Ginter that the medications she took in the morning for her arthritis made her ill, rendering her frequently unable to arrive at work by 8:00 a.m. Peters requested that she be scheduled for a later shift. (*Id.*) The customer service department had four scheduled shifts: 8:00 a.m. to 5:00 p.m., 9:00 a.m. to 6:00 p.m., 10:00 a.m. to 7:00 p.m., and 11:00 a.m. to 8:00 p.m. Peters was often scheduled to work from 8 a.m. to 5 p.m. (*Id.*) Upon hearing Peters's medical issue, Ginter allowed Peters to work the 9:00 a.m. to 6:00 p.m. shift.

In October of 2013, Peters requested, per her doctor's recommendation, to work remotely during the winter season because the cold temperatures in Houghton, Michigan exacerbated her arthritis. (*Id.* at 7) Again, Ginter, along with then-President Ed Burger, supported Peters's request. Peters worked remotely from Florida from December 2013 to June of 2014. (Doc # 18, Pg. 11) During this period, Peters arrived late to work at times because of the arthritis and her medications. (*Id.*)

In May 2014, Tim Korby ("Korby") replaced Ginter (who retired) as Assistant Vice President ("AVP") of Customer Service. (*Id.*) Korby reported to Rhonda Welsh, the Senior Vice President of Loan Administration. Korby was Peters's direct supervisor. Korby learned that Peters was working remotely due to her disability. (Doc # 22, Pg. 7) When Peters returned to Houghton in June 2016, Korby approved Peters request for a new chair to accommodate her arthritis. (Doc # 18, Pg. 11)

Within a month of becoming Peters's supervisor, Korby e-mailed Revord because he had concerns about Peters's accommodation arrangement with MLS to work remotely during the winter months. (Doc # 22, Pg. 8) In a subsequent discussion with Revord about Peters's accommodation, Korby claimed that Peters's "production is not very good" and told Revord that he intended to set "stricter expectations" on her. (*Id.*) After speaking with Korby, Revord requested that MLS's Talent Manager, Nick Raubenolt, begin searching for a customer service representative "fluent in Spanish." (*Id.*) The new hire was supposed to serve as support for Peters. *Id.*

On July 7, 2014, Peters sent an email to Korby requesting time off on July 9 and 10. (Doc # 18, Pg. 12) Korby replied: "Why such short notice?" Peters responded: "Something that just happened now." (*Id.*) Korby and Peters met to discuss her request for time off. (*Id.*) Peters informed Korby that she had received

a letter from Homeland Security scheduling an appointment for July 10. (*Id.*) The letter was dated June 28, 2014. (*Id.*) Peters alleges that Korby stated, "some people from immigration were here looking for somebody," during the meeting. (Doc # 18-2, Pg. 16) Korby approved Peters's request for time off. (Doc # 18, Pg. 12)

Peters sent an email to Revord a few hours after the meeting between Korby and Peters. (*Id.*) Peters expressed that she did not like explaining herself to Korby. (*Id.*) Peters also described the change in her work environment after Korby became her supervisor. Peters complained: (1) "[f]or some reason [] Korby has a problem talking or working with me"; (2) Korby was "not nice" and gave her a "hostile vibe"; (3) the last time she needed to visit the immigration office to update her residence status, Korby "asked her personal questions and the reasons why I [Peters] had to go there"; (4) "[Korby] really makes me feel uncomfortable because he treats me different from the rest of the people in my department." (Doc # 22, Pg. 9)

Peters had continued to work almost exclusively on payoffs when Korby became her supervisor. Korby felt that Peters was unable to keep up with the payoffs and often required assistance from other employees to complete her work. (Doc # 18, Pg. 13) Korby received emails from Peters and her colleagues stating that Peters needed assistance with completing the payoffs. (*Id.*) Korby concluded

that he could hire an entry level employee who could do a better job of handling the payoffs than Peters. (*Id.*) Korby felt that this could allow him to assign Peters to work the queue like the other CSAs. (*Id.*)

On August 5, 2014, MLS posted an opening for a position identical to Peters's role completing the payoffs on external sites. (Doc # 22, Pg. 11) Peters saw the posting, and emailed Korby to find out why the position was posted. Korby replied that the position was merely a "back-up." (*Id.*) Peters alleges that, following the email exchange, Korby came to her work station and asked her, "Did you freak out?" (*Id.*)

Korby decided to contact MLS's Talent Acquisition Manager, Nick Raubenolt, to recommend her sister, Nora Garduno ("Garduno"), for the position. (*Id.*) After reviewing Garduno's resume and finding her to be a qualified candidate, Raubenolt scheduled an interview for Garduno with Korby. (*Id.*)

Korby emailed his supervisor, Rhonda Welsh ("Welsh") stating, "Good news, we got a Spanish speaking applicant. Bad news, it's Lorena's sister. I will go into this interview open minded but this doesn't really solve our overall issue." (*Id.* at 12) Korby sent a similar email to Revord. Revord responded, "You are right. Lorena's sister in the position will complicate things even more." (*Id.*) Revord decided to contact Raubenolt and inform him that hiring Garduno would

violate MLS's nepotism policy.[1]  (*Id.*)  Garduno's scheduled interview was subsequently canceled.  Korby hired Karissa Satala to the entry level, and lower-paying, position of Customer Service Assistant.

In September 2014, Korby began changing Peters's work assignments.  (*Id.*)  He removed Peters direct phone line, which was used by Spanish-speaking borrowers to reach her.  Peters alleges that when she asked Korby what those callers would do without the direct line to Peters, Korby responded, "They should speak English."  (Doc # 18-2, Pg. 85)  Korby also reassigned Peters to the customer service queue, instructed Peters to change her job title form Spanish Language Specialist to Customer Service Representative, and he removed Peters from payoffs.  (Doc # 22, Pg. 13)  To assist Peters with her transition to the queue, Korby assigned a co-worker, Jen Pindral, to provide Peters with on the job training.  (Doc # 18, Pg. 13)  Pindral advised Peters and Korby that Peters could effectively work the queue.  *Id.*

On October 27, 2014, Korby issued Peters a verbal warning for tardiness.  (*Id.* at 14)  Peters alleges that symptoms from her arthritis medications were the cause of her frequent tardiness.  (Doc 3 22, Pg. 14)  After Peters explained the

---

[1] Revord admitted in deposition that hiring Garduno would not have violated the company's nepotism policy.  (Doc # 22-41, Pg. 35)  The stated reason for not selecting Garduno for the position was that another "candidate was a more effective communicator." (*Id.*).

reasons for her tardiness to Korby via email, he forwarded the response to Welsh stating, "Always with an excuse." (*Id.*)

On October 31, 2014, MLS approved Peters's request to work remotely, and she left for Florida the next day. (Doc # 18, Pg. 14) On November 18, 2014, Korby sent Peters an email stating that her call volumes were below average. (*Id.*) He asked Peters to draft a detailed explanation and send it to him that day. He also asked Peters to call him after she sent the email. (*Id.*) Peters never sent the email. On November 20, 2014, Korby issued Peters a written Corrective Action due to her poor performance and insubordination. (*Id.*) Peters admitted that she took fewer calls than other CSAs. (*Id.*) Peters responded on November 21, 2014, explaining to Korby that this was her first time working in the queue. (*Id.*)

On November 28, 2014 at 8:14 a.m., Peters sent Korby an email informing him that she would not be in that day because she was sick. (*Id.*) Korby replied via email asking why she reported her absence fourteen minutes after her start time. Hours later, Peters sent Korby a reply stating: (1) she was throwing up; (2) she never had a problem with a previous supervisor; (3) she was hired to service Spanish-speaking customers; (4) she alleged that Korby said "customers should speak English"; (5) asked who else could service their Spanish-speaking customers; (6) claimed that she was unable to satisfy her daily quote of calls due to Korby's changes; and (7) accused Korby of threatening her daily with termination

or disciplinary action. (Doc # 22, Pg. 15-16) Finally, Peters stated in the email, "If my being Hispanic offends you I am sorry. Instead of all this unnecessary harassment you can lay me off." (*Id.*) Peters never discussed the email with Korby or anyone else in management. (Doc # 18, Pg. 17)

Later that day, Korby forwarded Peters's email to Revord and stated, "I would like to discuss the option of letting Lorena go." Korby also cited Peters's insubordination and complaints about him. (Doc # 22, Pg. 16) On December 1, 2014, Revord replied to Korby's email stating, "Agreed." (*Id.*) Korby terminated Peters on December 4, 2014. (*Id.*) The stated reasons for Peters's termination were tardiness and poor performance. Korby replaced Peters with Kassie Daavtilla. (*Id.* at 17)

On November 6, 2015, Peters applied for Social Security Disability Insurance ("SSDI"). (Doc # 18, Pg. 17) In her application, Peters stated she "became unable to work because of my disabling condition on December 4, 2014." (*Id.*) She also stated, "I am still disabled." *Id.* Peters also stated that her condition became severe enough to keep her from working on December 4, 2014. (*Id.*) Peters has not looked for work since filing the SSDI application.

In the Function Report submitted in support of her SSDI application, Peters stated that she could not perform any of the tasks required by her job as a CSA. In a Cervical Spine Medical Source Statement submitted in support of her

application, Peters's physician, Dr. Thomas McConnon, opined that Peters's conditions are permanent, and imposed several imitations on her mobility. (*Id.* at 18) In a December 5, 2016 letter to the Social Security Administration, Peters's attorney represented that, effective December 4, 2014, Peters's arthritis and other conditions prevented her from performing any of her past work and any regular full-time employment. (*Id.* at 19) Peters's attorney added that "it was Dr. McConnon's opinion that these restrictions were in effect since the AOD of December 4, 2014." (*Id.*) Peters's initial application for SSDI was denied and is currently on appeal.

Peters brings claims against Defendants for disability discrimination and retaliation, violations of the Family and Medical Leave Act, and national origin discrimination. (Doc # 1) For the reasons set forth below, Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

## II.   ANALYSIS

### A.  Standard of Review

The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-57 (1986). A fact is material if it could affect the outcome of the case based on the governing substantive law. *Id.* at 248. A dispute about a material fact

is genuine if, on review of the evidence, a reasonable jury could find in favor of the nonmoving party. *Id.*

The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the nonmoving party must "go beyond the pleadings and … designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. The Court may grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Conclusory allegations do not create a genuine issue of material fact which precludes summary judgment." *Johari v. Big Easy Restaurants, Inc.*, 78 F. App'x 546, 548 (6th Cir. 2003).

When reviewing a summary judgment motion, the Court must view the evidence and all inferences drawn from it in the light most favorable to the nonmoving party. *Kochins v. Linden-Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir. 1986). The Court "need consider only the cited materials, but it may consider

other materials in the record."  Fed. R. Civ. P. 56(c)(3).  The Court's function at the summary judgment stage "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## B.  ADA and PWDCRA (Counts I and II)

### 1.  *Discrimination Claims*

The ADA provides that

> [n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).  An employee may prove disability discrimination using the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973):  "the employee has the initial burden of establishing his *prima facie* case; if he does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; finally, the employee has the burden of rebutting the employer's proffered reasons by showing them to be pretextual."  *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427, 433 (6th Cir. 2014).

To make out a *prima facie* case under the ADA, the plaintiff must establish by a preponderance of the evidence that:  (1) he is disabled within the meaning of

the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) he suffered an adverse employment action because of his disability. *Id.* at 433. The plaintiff's disability must be a "but for" cause of the adverse employment action. *Id.* Neither party disputes that Peters is disabled within the meaning of the ADA.

Defendants first argue that Peters's statements in her application for SSDI preclude her from establishing a *prima facie* case under the ADA or the PWDCRA because they establish that Peters could not perform her job at MLS, or any other position as of her termination date. (Doc # 18, Pg. 21) Peters argues that the evidence shows she could perform the essential functions of her job on the date of her termination. (Doc # 22, Pg. 18)

Peters must show that she is otherwise qualified to perform the CSA job requirements, with or without reasonable accommodation. *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 598 (6th Cir. 2002) (citing *Monette v. Elect. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996)). The PWDCRA "substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim." *Cotter*, 287 F.3d at 597. The Court reviews both claims under the same standard.

Defendants direct the Court to representations made by Peters and her attorney in her application for SSDI, indicating that she has been unable to work as

a CSA or in any other position since December 4, 2014. Defendants highlight: (1) her attorney's representation that Peters's conditions prevent her from performing any of her past work, and any full-time competitive employment; (2) Peters stating that she has been unable to use a computer or type, an essential function of her CSA job; and (3) Dr. McConnon's conclusions regarding Peters's severe, permanent physical limitations on her ability to work and concentrate. (Doc # 18, Pg. 21-23) Peters argues Defendants have not provided any evidence of her inability to perform the essential functions of her job while employed at MLS.

Claims for SSDI benefits and for damages under the ADA do not inherently conflict to an extent that requires a court to apply a negative presumption to the ADA claim. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 802-03 (1999). In some cases, however, the SSDI claim may genuinely conflict with an ADA action. *Id.* at 806. A plaintiff bringing an ADA claim who asserts that she is unable to perform any competitive employment in her SSDI application must proffer a sufficient explanation. *Id.* The "party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement . . . without explaining the contradiction or attempting to resolve the disparity." *Id.* The explanation must be sufficient to allow a reasonable juror to conclude, assuming the truth of plaintiff's good faith

statement, that plaintiff could perform the essential functions of her job, with or without reasonable accommodation. *Id.*

Peters provides the following: (1) in response to a prompt (on her application), Peters stated that she stopped working because of her "arthritis conditions" and the new supervisor terminated her accommodations and laid her off (Doc # 22-45); (2) Peters provided similar statements regarding her ability to work with accommodations throughout her application; (3) Peters testified in her deposition that she was able to work with accommodations, and that she continued to look for work following her termination; (4) the basis for the denial of Peters's SSDI application was the determination that her disability was "not severe enough" to preclude her from working; and significantly, (5) the agency specifically determined that her impairments did not prevent her from performing the work required in her job as a CSA. (Doc # 22-46; Doc # 22, Pg. 18-21) A plaintiff can survive summary judgment by explaining that she can perform the essential functions of her position with a reasonable accommodation–"a consideration the Social Security Administration's (SSA) disability determination does not take into account." *Stallings v. Detroit Pub. Sch.*, 658 F. App'x 221, 226 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 648 (2017). Peters has provided more than required. The Court finds that there exists a genuine issue of material fact regarding Peters's ability to perform the essential functions of her job at MLS.

Defendants also argue they did not violate the ADA or the PWDCRA because the undisputed evidence establishes that MLS reasonably accommodated Peters's disability by, among other things, allowing her to work remotely. Defendants add that Peters was terminated due to her attendance, poor performance, and resistance to working in the queue. (Doc # 18, Pg. 26) Peters argues that Korby's decision to deny her request to work the 9 a.m. to 6 p.m. shift and failure to participate in an interactive process with Peters was in violation of the ADA and the PWDCRA. (Doc # 22, Pg. 21)

The ADA requires an employer like MLS to make "reasonable accommodations to the known . . . limitations of an otherwise qualified individual with a disability" where such an accommodation does not cause the employer "undue hardship." 42 U.S.C. § 12112(b)(5); *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015). To comply, MLS must reasonably accommodate Peters (who neither party disputes is disabled) if she is "qualified." §§ 12112(a), (b)(5); *EEOC v. Ford*, 782 F.3d at 761 (citing *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997)).

Peters must be able to perform the essential functions of a CSA with or without reasonable accommodation to be a qualified individual. 42 U.S.C. § 12111(8); *EEOC v. Ford*, 782 F.3d at 761. Such a reasonable accommodation may include "job restructuring [and] part-time or modified work schedules." 42 U.S.C.

§ 12111(9)(B).  It does not include, however, removing an "essential function" from the position, as such would be *per se* unreasonable.  *EEOC v. Ford*, 782 F.3d at 761 (citing *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 850 (6th Cir. 1998)).

Defendants argue that Peters's proposed accommodation of working from 9 a.m. to 6 p.m. was unreasonable because employees are assigned to work the customer service queue—to which Peters was assigned by Korby—from 8 a.m. to 8 p.m., and shifting Peters schedule would have placed a greater burden on the other employees.  (Doc # 18, Pg ID 27)   The evidence, however, does not support Defendants' position.  Both parties highlight the fact that Ginter allowed Peters to report to work from 9 a.m. to 6 p.m. with no detriment to MLS.

To the contrary, the evidence provided indicates that the change in Peters's schedule to the later time was considered a positive for the company.  (Doc # 22-39, Pg. 12)  The fact that Ginter allowed Peters to work on payoffs does not prove that Peters working the queue later in the day would have been an undue hardship to MLS.  Also, there has been no evidence provided which indicates that Peters could not work a 9 a.m. start time.  Defendants have failed to show that Peters's requested accommodation would have been an undue hardship within the meaning of § 12111(10)(a).  There exists a genuine issue of material fact as to whether the accommodation requested by Peters was "reasonable" within the meaning of §

12111(9), and whether Peters is a qualified individual under § 12111(8). A reasonable juror could find that Peters is qualified based on the facts provided.

"To determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]." 29 C.F.R. § 1630.2(o)(3). The purpose of this process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* "The interactive process requires communication and good-faith exploration of possible accommodations." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir.2000) (en banc), *judgment vacated on other grounds*, 535 U.S. 391 (2002). The interactive process is mandatory, and both parties have a duty to participate in good faith. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007).[2] Defendants have not shown that they engaged in an interactive process with Peters.

Defendants further argue that Peters cannot establish a *prima facie* case for disability discrimination because she has no evidence that MLS's reasons for discharging her were pretext for unlawful discrimination. (Doc # 18, Pg. 28) Defendants indicated that Peters's employment was terminated due to her consistent tardiness and poor performance. Peters argues that she was terminated

---

[2] The Court notes that Peters's first mention of the interactive process issue was in her Response to Defendants' Motion for Summary Judgment.

because Korby did not want to grant her accommodation request. (Doc # 22, Pg. 25)

An employee bringing an ADA claim can show pretext by offering evidence that an employer's stated reason for termination (1) had no basis in fact, (2) did not actually motivate its decision, or (3) was never used in the past to discharge an employee. *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998) (citing *Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 883 (6th Cir.1996)).

The only pretext issue in this case is whether MLS's stated reasons for discharging Peters actually motivated the decision to terminate her employment. Defendants have provided some evidence to support their position that Peters was fired because of her consistent tardiness and work performance.

Defendants highlighted several occasions where Peters not only admitted to being tardy, but also expressed a belief that she was justified in doing so due to her medications. In addition to the instances where Peters admitted to being tardy, Defendants have provided evidence of Peters's tardiness while being accommodated with remote employment in Florida. Regarding Peters's work performance, Defendants have provided evidence that Peters continuously complained about working the queue, which was part of her job description, even after being given additional training to support her transition back to that assignment.

Peters points to Korby's expressed disapproval of allowing employees to work remotely, and his referring to remote work as a "vacation," as evidence to support her pretext argument. Korby, however, granted Peters's request to work remotely despite his personal disagreement and approved her request for a special seat to accommodate her arthritic condition. In light of the evidence submitted by the parties, there is a genuine issue of material fact as to whether tardiness and work performance were reasons for her termination. If Peters was allowed by Korby to work at a later time, tardiness may not have been a reason for the termination. Korby's reference to Peters's remote work as a "vacation" creates a genuine issue of fact that her tardiness was mere pretext for the termination and that Korby terminated Peters because of her disability and any required accommodation for such disability. A reasonable juror could find that Peters was terminated because of her disability based on the facts provided.

Defendants' Motion for Summary Judgment is **DENIED** with respect to Peters's ADA and PWDCRA discrimination claims for termination and for failure to provide a reasonable accommodation.

## 2. *Retaliation Claim*

The ADA's retaliation provision makes it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). To establish a *prima facie* case of retaliation under the ADA and PWDCRA, the plaintiff must show that (1) she engaged in activity protected by the ADA; (2) the defendant knew of this exercise of plaintiff's protected rights; (3) the defendant subsequently took an employment action adverse to plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment: and (4) there was a causal connection between the protected activity and the adverse employment action. *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 422 (6th Cir. 2015) (citation omitted). "If the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for the adverse employment action." *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir.1997). The plaintiff bears the burden of proving that the defendant's "proffered reason for the action was merely a pretext for discrimination." *Id.* (citation omitted).

Requests for accommodation are protected acts under the law of the Sixth Circuit. *See A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir.2013) ("Both this circuit and most others agree that requests for accommodation are protected acts."). This Court has already determined that a reasonable jury could find Peters's request for a different work shift to be a reasonable accommodation within the meaning of 42 U.S.C. § 12111(9). To the

extent a jury finds Peters's accommodation request reasonable, there is no dispute that Defendants knew of the request or that MLS took an adverse employment action against Peters following the request.

The only issue is whether there was a causal connection between the protected activity and the adverse employment action. Plaintiff's burden is "minimal at the *prima facie* stage, requiring merely that they 'put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity.'" *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 699 (6th Cir. 2013) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000)). The evidence must, however, be sufficient to allow for an inference that the adverse employment action would not have occurred if plaintiff had not engaged in the protected activity. *A.C. ex rel. J.C.*, 711 F.3d at 699. In short, the protected activity must have been a "but for" cause of the adverse employment action. Adopting the same rationale applied to the pretext issue regarding Peters's ADA and PWDCRA discrimination claims, a reasonable jury could find that Peter's accommodation request was a "but for" cause of her termination. Defendants' Motion for Summary Judgment regarding the ADA and PWDCRA retaliation claims is **DENIED**.

### C. Title VII and ELCRA/National Origin Claims (Counts IV and V)

The Sixth Circuit reviews claims of discrimination brought under the ELCRA under the same standards as claims brought under Title VII. *Idemudia v. J.P. Morgan Chase*, 434 F. App'x 495, 499 (6th Cir. 2011) (citation omitted). A plaintiff must proffer either direct or circumstantial evidence of discrimination to establish a *prima facie* case for Title VII or ELCRA national origin discrimination. Peters offers circumstantial evidence in support of her claim.

To prove intentional discrimination using indirect or circumstantial evidence, Peters must use the burden-shifting framework established in *McDonnell Douglas* and modified in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981);[3] *Idemudia v. J.P. Morgan Chase*, 434 F. App'x, at 500. A plaintiff first bears the 'not onerous' burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *Id.* (citations omitted). Once a plaintiff establishes a *prima facie* case, there is a presumption of discrimination. *Id.* Then the burden shifts to the defendant to rebut the presumption by providing evidence of a "legitimate, nondiscriminatory reason" for the adverse action taken. *Id.* (citation omitted). Once the defendant has provided a legitimate, nondiscriminatory explanation, the burden shifts back to the plaintiff to show that the defendant's stated reasons were pretext for discrimination. *Id.* "Throughout

---

[3] Peters does not allege a mixed-motive claim pursuant to 42 U.S.C. § 2000e-2(m). *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396-402 (6th Cir. 2008) (rejecting application of the *McDonnell Douglas/Burdine* framework for single-motive claims to mixed-motive claims). Peters argues that the stated reasons for her termination were pretext for the unlawful, discriminatory purpose.

this burden-shifting approach, the plaintiff continues to bear the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir.2006).

Peters may establish a *prima facie* case by showing: (1) she is a member of a protected class; (2) she was terminated; (3) she was qualified for the position; and (4) she was replaced by a person outside of a protected class or, alternatively, was treated differently than a similarly situated, non-protected employee. *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 501 (6th Cir. 2007).

Defendants argue that Peters cannot establish a *prima facie* case because she is not a qualified employee. (Doc # 18, Pg 23) This Court has previously stated that a reasonable juror could conclude Peters is qualified by a preponderance of the evidence.[4] The Court must focus on a plaintiff's objective qualifications to determine whether she is qualified for the relevant job "at the time of discharge." *Vincent v. Brewer,* 514 F.3d 389, 395 (6th Cir. 2007). In its reply brief, Defendants argue that Peters has not submitted evidence of disparate treatment or rebutted the fact that Korby discharged non-Hispanic employees for similar reasons. Peters seeks to file a sur-reply brief addressing the disparate treatment evidence. Defendants oppose the motion noting that Peters had sufficient time to

---

[4] See Section II.A.1 of this Opinion and Order.

address disparate treatment evidence in her response brief, and that the request is untimely.

It is noted that neither party engaged in an analysis of the four elements to establish a *prima facie* case, other than whether Peters was qualified for the relevant job. The parties mostly argue the legitimate reason and pretext prongs of the *McDonnell Douglas/Burdine* burden shifting analysis and appear to somewhat conflate the *prima facie*, legitimate reason and pretext prongs arguments.

To be clear, as to the *prima facie* portion of the analysis, the Court, for purposes of this motion only, finds that Peters has established a *prima facie* case: (1) Peters is a member of a protected class as a Hispanic woman; (2) she was terminated; (3) there is a question of fact as more fully noted above, that she was qualified at the time of discharge; and (4) she was replaced by a "naturally born American citizen," a Caucasian. The Court proceeds under the assumption that Peters has established a *prima facie* case. The Court will not consider Peters's sur-reply brief on the alternative disparate treatment argument under the fourth prong, because the Court has found, as admitted by her supervisor, Korby, that Peters was replaced by an "American" and Caucasian woman. The fourth element of a *McDonnell Douglas/Burdine* criteria is whether the plaintiff was replaced by a person outside the class, or, alternatively, a plaintiff may show that a comparable non-protected person was treated better. *Mitchell v. Toledo Hospital,* 964 F.2d

577, 582 (6th Cir. 1992). Korby has satisfied the fourth prong of a *prima facie* case.

Shifting the burden to the Defendants, for the purposes of this motion, Defendants have provided sufficient evidence to support their contention that tardiness and poor performance were the reasons for discharging Peters. Those are legitimate, nondiscriminatory reasons. Peters must then be able to prove, by a preponderance of the evidence, that the legitimate reasons offered by the Defendants were pretext for discriminating against Peters based on her national origin. Peters may establish pretext by showing that Defendants' stated reasons (1) have no basis in fact; (2) did not actually motivate her termination; or (3) were insufficient to warrant her termination. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Peters argues that poor performance and tardiness did not actually motivate her termination.

A court must "ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009). The ultimate decision is whether the evidence of pretext, combined with the evidence establishing the plaintiff's *prima facie* case, would allow "the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147-48 (2000).

Peters provides a variety of circumstantial evidence to cast doubt on Defendants' explanation for her termination. Peters highlights that Korby was the first person at MLS to tell her she was a poor performer. Peters also highlights evidence that her performance just prior to her termination was comparable to the other members of the customer service department, which Korby acknowledged. (Doc # 22-36; Doc # 22-40, Pg ID 53-54) Korby did not terminate the workers whose performance was comparable to Peters's performance.

To further support her contention of pretext, Peters directs the Court to several statements made by Korby during the events leading up to her termination. When Peters informed Korby that she was required to meet with Homeland Security, Korby stated, "some people from immigration were here looking for somebody." (Doc # 18-2, Pg. 78) Peters alleges that Korby told her that callers "should speak English." (*Id.* at Pg. 85) Peters also alleges that Korby made her remove the Spanish greeting from her voicemail and stated, "We are in America." (*Id.* at Pg. 85-86) Korby replaced Peters with Kassie Daavtilia, "from America," a Caucasian woman. (Doc # 22-40, Pg. 225)

Peters has presented evidence sufficient to raise a genuine issue of material fact that Defendants' decision to terminate her was mere pretext, combined with evidence establishing a *prima facie* case of discrimination. Summary judgment is **DENIED** on Peters's discrimination claims under Title VII and ELCRA claims.

The Court notes that Peters has not pled a retaliation claim under Title VII or the ELCRA.

## D. FMLA Claim (Count III)

The Sixth Circuit recognizes "two distinct theories for recovery under the FMLA: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Hoge v. Honda of America Mfg., Inc.,* 384 F.3d 238, 244 (6th Cir.2004). Defendants argue that summary judgment should be granted against Peters under both theories because Peters never expressed a need or intention to exercise her rights under the FMLA.

An employee must give her employer sufficient notice of her intention to use family medical leave whenever possible. 29 C.F.R. § 825.302(a); *Killian v. Yorozu Auto. Tennessee, Inc.*, 454 F.3d 549, 554 (6th Cir. 2006). The notice "need not expressly assert rights under the FMLA . . . ." 29 C.F.R. § 825.302(c).

Any FMLA theory Peters could argue requires that she actually needed to take family medical leave. Peters has not provided any evidence that establishes she needed to take family medical leave or intended to do so. Peters points to instances where she made her managers aware that she has arthritis to support her FMLA theories, however, a desire to obtain a modified work schedule does not express an intention to take family medical leave. Peters has not carried her

burden that she requested leave under the FMLA. Summary judgment is **GRANTED** against Peters with respect to her FMLA claim.

## III.    CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Defendants Universal Bank and MLS's Motion for Summary Judgment **(Doc. # 18)** is **GRANTED IN PART AND DENIED IN PART.** The motion is GRANTED as to as to the Family and Medical Leave Act (Count III) and this count is DISMISSED. The motion is DENIED as to the American with Disabilities Act (Count I), the Michigan Persons with Disabilities Civil Rights Act (Count II), Title VII of the Civil Rights Act (Count IV) and the Elliott-Larsen Civil Rights Act (Count V) and these counts REMAIN.\

IT IS FURTHER ORDERED that Plaintiff's Motion for Leave to File Sur-Reply Brief **(Doc. # 29)** is **DENIED**.

IT IS FURTHER ORDERED that the following schedule governs this matter:

The proposed Joint Final Pretrial Order must be submitted by:   May 7, 2018

Any motions in limine must be filed by:                         May 7, 2018

The Final Pretrial Conference is set for:                       May 21, 2018
   (All parties with authority to settlement must appear)       @ 2:00 p.m.

The Trial is set for:                                      June 19, 2018
                                                           @ 9:00 a.m.


                    S/Denise Page Hood
                    Denise Page Hood
                    Chief Judge, United States District Court

Dated:  March 30, 2018

I hereby certify that a copy of the foregoing document was served upon counsel
of record on March 30, 2018, by electronic and/or ordinary mail.

                    S/LaShawn R. Saulsberry
                    Case Manager